ORIGINAL

AO 91 (Rev. 11/82)

# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA | |
|---|---|---|
| UNITED STATES OF AMERICA<br>v.<br>SCOTT CHRISTOPHERSON and ALEJANDRO IBARRA | DOCKET NO. | FILED<br>CLERK, U.S. DISTRICT COURT<br><br>MAR - 6 2018<br><br>CENTRAL DISTRICT OF CALIFORNIA<br>BY _____ DEPUTY |
| | MAGISTRATE'S CASE NO.<br>ED18MJ 83 | |

Complaint for violation of Title 18, United States Code, Sections 371, 2320(a)

| NAME OF MAGISTRATE JUDGE<br>THE HONORABLE **ALEXANDER F. MACKINNON** | UNITED STATES MAGISTRATE JUDGE | LOCATION<br>Los Angeles, California |
|---|---|---|
| DATE OF OFFENSE<br>March 4, 2018 | PLACE OF OFFENSE<br>Riverside County | ADDRESS OF ACCUSED (IF KNOWN) |

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

[18 U.S.C. §§ 371, 2320(a)]

Beginning on a date unknown and continuing to March 4, 2018, in Riverside County, within the Central District of California, and elsewhere, defendants SCOTT CHRISTOPHERSON and ALEJANDRO IBARRA, knowingly and with intent to defraud, combined, conspired and agreed with each other to commit the following offense against the United States: to traffic in counterfeit goods, namely, counterfeit Xanax, in violation of Title 18, United States Code, Section 2320(a).

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: **N/A**

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>Nicolas A. DeSimone |
|---|---|
| | OFFICIAL TITLE<br>Special Agent – Homeland Security Investigations |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE[1] | DATE<br>March 6, 2018 |
|---|---|

[1] See Federal Rules of Criminal Procedure 3 and 54

AUSA Scott Lara x0427   REC: Detention

**AFFIDAVIT**

I, Nicholas A. DeSimone, being duly sworn, declare and state as follows:

## I.  **PURPOSE OF AFFIDAVIT**

1.   This affidavit is made in support of a criminal complaint against, and arrest warrant for, SCOTT CHRISTOPHERSON ("CHRISTOPHERSON") and ALEJANDRO IBARRA ("IBARRA"), for Conspiracy to Traffic in Counterfeit Goods in violation of 18 U.S.C. §§ 371, 2320(a).

2.   This affidavit is also made in support of an application for a search warrant to search the following:

a.   The single family residence located at 29782 Painted Desert Drive, Menifee, California 92584 ("SUBJECT RESIDENCE"), as further described in Attachment A-1;

b.   A Huawei Nexus cell phone Model Number H1511, Serial Number: 8487N16125001960, IMEI Number: 867686022321788 seized during the arrest of CHRISTOPHERSON ("SUBJECT DEVICE 1"), as further described in Attachment A-2;

c.   A Lorex 4k Network Digital Video Recorder, Model Serial Number ND031710018905, ("SUBJECT DEVICE 2"), and a SanDisk Cruzer Thumb Drive, Serial Number SDCZ36-008G, ("SUBJECT DEVICE 3"), and a silver Acer Aspire V5, Serial Number NXM49AA0333140DA1F6600 with a Gemalto Authentication Dongle, ("SUBJECT DEVICE 4," collectively with SUBJECT DEVICE 1, SUBJECT DEVICE 2, and SUBJECT DEVICE 3, the "SUBJECT DEVICES") seized by Homeland Security Investigations ("HSI") from 41110 Sandalwood Circle #114, Murrieta, California, on March 4, 2018, and

1

currently maintained in the custody of HSI as described more fully in Attachment A-3.

3.    As further described in Attachment B, the requested search warrant seeks authorization to seize evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 371, 2320 (Conspiracy to Traffic in Counterfeit Goods), 18 U.S.C. § 924(c) (Possession, Use, Brandishing, and/or Discharging of a Firearm in Furtherance of a Drug Trafficking Crime or Crime of Violence), and 21 U.S.C. § 841(a)(1) (Possession with Intent to Distribute a Controlled or Counterfeit Substance) (the "Subject Offenses").  Attachments A-1, A-2, A-3, and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses, as well as my conversations and analysis with more experienced agents and officers who are familiar with drug trafficking.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. <u>BACKGROUND FOR SPECIAL AGENT NICHOLAS DESIMONE</u>

5.    I am a Special Agent ("SA") with the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement, HSI.  I have been employed as an SA with HSI since

February 2016.  I am currently assigned to the Office of the
Assistant Special Agent in Charge, Los Angeles International
Airport ("LAX").  I attended about 20 weeks of the Criminal
Investigator Training Program and HSI Special Agent Training at
the Federal Law Enforcement Training Center in Glynco, Georgia
where I received specialized training concerning violations of
the Controlled Substances Act contained within Title 21, among
other violations of the United States Code, and criminal
conspiracies involving the smuggling and distribution of
dangerous drugs.  Based on my training and experience, I am
familiar with drug distributors' methods of operation including
the receipt, distribution, storage, and manufacture of
controlled substances and counterfeit controlled substances.

     6.   I have been the case agent and assisting case agent
for multiple investigations involving drug distribution in the
Southern California area.  These investigations have focused on
drug distribution, firearms violations, and conspiracies
associated with drug offenses.  I am familiar with how digital
devices are used to facilitate and conceal these crimes.  I have
interviewed defendants, informants, and witnesses who have
personal knowledge regarding drug trafficking organizations.  I
have executed numerous search warrants to seize evidence of
violations of federal and state law, as well as arrest warrants
to apprehend individuals who have committed such violations.
Additionally, I have led and participated in numerous
investigations and operations to detect and combat the

importation, trafficking, distribution, and sales of fentanyl and fentanyl-related substances.

7.   Before my employment with HSI, I was a Border Patrol Agent with the United States Border Patrol, from March 2009 to 2016.  In 2009, I attended and completed the United States Border Patrol Academy in Artesia, New Mexico, which lasted about 20 weeks.

8.   Throughout my career as a federal agent, I have received numerous hours of training in drug investigations, investigative techniques, surveillance, and evidence collection.

9.   I am currently a member of the HSI-led Los Angeles Opioid Task Force ("OTF"), which is based at the LAX International Mail Facility ("IMF") in Torrance, California.  I have investigated the deaths of individuals as their deaths relate to controlled substances trafficking activities and I am familiar with the dangerous effects of fentanyl, fentanyl-related substances, and other synthetic opioids.  These investigations and operations have resulted in the dismantlement of clandestine drug laboratories, and numerous seizures of fentanyl, fentanyl-related substances, and other dangerous synthetic opioids, controlled substances, and contraband.

### III.  SUMMARY OF PROBABLE CAUSE

10.  In December 2017, HSI SAs and United States Postal Inspection Service ("USPIS") inspectors intercepted two parcels and found in these parcels Clonazolam, a benzodiazepine.  I know that benzodiazepine substances can be mixed with fentanyl, a controlled substance, for distribution.

4

11.   Law enforcement interviewed the two intended recipients of the parcels.   The intended recipients both told law enforcement that they were receiving packages on behalf of "Scott."   The second package recipient, C.P., told law enforcement that C.P. received packages for SCOTT CHRISTOPHERSON.   CHRISTOPHERSON also told C.P. that he made and sold pills.[1]

12.   On or about March 3, 2018, at C.P.'s residence, both C.P.'s mother's car and C.P.'s residence were shot, a nearby trashcan was tagged with CHRISTOPHERSON and IBARRA's monikers, and C.P. reported that somebody who sounded like CHRISTOPHERSON threatened C.P. over the phone.

13.   On or about March 4, 2018, OPD obtained a state search warrant for CHRISTOPHERSON and IBARRA's shared residence, 29782 Painted Desert Drive, Menifee, California 92584 (the "SUBJECT RESIDENCE"), which resulted in the discovery of approximately 500 pills stamped with "Xanax" markings.

14.   In a post-arrest interview with OPD detectives, IBARRA told law enforcement about IBARRA and CHRISTOPHERSON's involvement with the shooting of C.P.'s residence and with manufacturing pills.

15.   Investigators obtained a state search warrant and searched the location of IBARRA and CHRISTOPHERSON's pill-pressing operation, which resulted in the discovery of SUBJECT

---

[1] C.P. became a confidential source of information for law enforcement as they continued their investigation of CHRISTOPHERSON.   C.P. is cooperating to reduce C.P.'s sentencing exposure for C.P.'s role in this drug scheme.

DEVICE 2, SUBJECT DEVICE 3, SUBJECT DEVICE 4, a large commercial-grade chemical mixer, a pill press, a shipping receipt listing CHRISTOPHERSON's name and the SUBJECT RESIDENCE's address, unknown powders, and approximately several hundred to several thousand pills.  When CHRISTOPHERSON was arrested, he was found with a key on his key chain that could open the pill-press laboratory locks.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

16.  Based on my personal involvement, conversations with, and information obtained by Customs and Border Patrol ("CBP") officers and other HSI SAs, I know the following:

**A.   First Seizure of Clonazolam**

17.  On or about December 11, 2017, law enforcement discovered a suspicious international parcel sent from China bearing tracking number EV876738858CN addressed to J.G. at PO Box 7402, Orange, California (the "J.G. PARCEL").  The J.G. PARCEL came to my attention after it was referred to me by CBP Officer Patrick Burt.  The package continued in the mail stream to the Post Office in Orange, California.

18.  Officer Burt is a full-time member of CBP-Chicago's Tactical Analytical Unit.  Officer Burt's job is to analyze manifest data, seizure data, and other information that can help him identify commodities being smuggled into the United States, contrary to law.  CBPO Burt has, on numerous occasions, provided me with advanced information on controlled substances, specifically opioids, that has resulted in criminal

6

investigations, drug seizures, arrests, and the dismantlement of clandestine pill-pressing locations and drug labs.

19. Officer Burt, in this occasion, told me that analyzed data for the shipping manifest, as well as the shipper's history. The Chinese shipper, Zhouxiang, had several shipments delivered to the United States in the several days prior to this referral which had resulted in CBP intercepting them and seizing contraband.

20. Officer Burt opined that it was probable that this shipment might have controlled substances or otherwise illicit contraband in it. I am not aware of and do not recall any instances of Officer Burt providing me with incorrect opinions or referrals on probable shipments of contraband.

21. On or about December 15, 2017, law enforcement intercepted the package before it was received by J.C. but after it arrived at the Post Office in Orange, California.

22. There, CBP conducted a border search examination of the package and discovered it contained approximately 446.5 grams of a yellow, powdery substance. Using a substance field test, the substance was presumptively identified as Clonazolam, a benzodiazepine similar to Alprazolam.

23. On or about December 18, 2017, USPIS Inspector Joseph Weidenkopf wrote his phone number[2] on a USPS Form 3849, Delivery

---

[2] Inspector Weidenkopf did not indicate he was law enforcement and left the number merely as an employee of USPS. Postal inspectors regularly act in an undercover capacity like this in furtherance of criminal investigations.

Notice/Reminder/Receipt, and left it in PO Box 7402.  Inspector
Weidenkopf did not leave the package in the PO Box.

24.  On or about December 22, 2017, Inspector Weidenkopf
received a telephone call from J.G.  Over the course of several
phone calls, Inspector Weidenkopf, acting in an undercover
capacity as a regular United States Postal Service ("USPS")
employee, made arrangements to have J.G. pick up the J.G. PARCEL
at the Orange Post Office on December 28, 2017.

**B.    J.G. Interview**

25.  Law enforcement conducted a database check and learned
that J.G. was driving on a suspended license.  On or about
December 28, 2017 law enforcement saw J.G. arrive at the Orange
Post Office and asked to speak to J.G.  Law enforcement took
J.G. aside, read J.G. his <u>Miranda</u> rights, which he waived, and
interviewed J.G.  During that interview, J.G. said the following
in summary:

a.    J.G. was picking up the J.G. PARCEL for a friend,
C.P., who was hired by a man J.G. only knew as "Scott" to open
PO boxes and receive packages on Scott's behalf.  C.P. would pay
J.G. $100 for each package he received on C.P. and Scott's
behalf.

b.    J.G. had previously received one package via the
mail for Scott.

c.    J.G. did not know what was in the packages, but
assumed it was something illegal.

8

d.    J.G. retrieved the packages from the PO box, then delivered them to C.P. at C.P.'s house.  C.P. would then deliver them to Scott at a location in Temecula, California.

**C.    C.P. Interview**

26.  On or about January 2, 2018, law enforcement called C.P. and requested that C.P. speak to law enforcement about an unrelated restraining order investigation where she was listed as a witness.  C.P. came to the OPD station and was interviewed by Detective Taketa about the restraining order investigation.

27.  After speaking with C.P. about the restraining order investigation, Detective Taketa asked C.P. if he could speak to C.P. about another investigation.  Detective Taketa explained that C.P. was free to leave, and was not under arrest.  C.P. agreed to speak to Detective Taketa.

28.  During this interview of C.P., Detective Taketa learned the following in summary:

a.    After initially denying that s/he received packages from China, C.P. admitted s/he was paid by CHRISTOPHERSON whom C.P. had met in October 2017, to open a PO box and receive packages on his behalf for $100 each package.

b.    C.P. opened PO Box 2671, Orange, California 92859 (the "C.P. PO Box") for the purpose of receiving parcels on CHRISTOPHERSON's behalf.

c.    C.P. received two parcels on CHRISTOPHERSON's behalf.  One of which, C.P. delivered to CHRISTOPHERSON's then-residence in Santa Ana, California.  CHRISTOPHERSON picked up the other parcel from C.P.'s residence.

9

      d.   CHRISTOPHERSON told C.P. that he was making counterfeit Xanax by "pressing pills."

      e.   C.P. thought that CHRISTOPHERSON also sold drugs.

      f.   C.P. agreed to notify Detective Taketa when CHRISTOPHERSON would have parcels sent to C.P.'s PO box.

**D.   Second Seizure of Clonazolam**

29.  On or about January 8, 2018, Inspector Weidenkopf discovered that the C.P. PO Box contained a package (the "C.P. PARCEL") addressed from China.  Detective Taketa spoke with C.P., who was unaware of the parcel, but provided consent for law enforcement to take the package.

30.  On or about January 9, 2017, I met Inspector Weidenkopf and Detective Taketa at the OPD station and examined the unopened C.P. PARCEL.  The package was addressed from the same sender and address as the J.G. PARCEL, and had arrived in the United States from China several days earlier.

31.  Inspector Weidenkopf informed me that the C.P. PARCEL had been in government possession since entering the United States.  Based on my knowledge of the previous seizure of Clonazolam from the same sender, my knowledge of CHRISTOPHERSON's drug importation network, and C.P.'s statements, I had reasonable suspicion to believe the C.P. PARCEL contained drugs.

32.  I performed a border search of the C.P. PARCEL and discovered a yellow, powdery substance, similar to the substance

from the J.G. PARCEL.  Using a substance field test, the
substance was presumptively identified as Clonazolam.[3]

**E.    Packages Sent to C.P.'s Residence**

33.  On or about January 22, 2018, C.P. contacted Detective
Taketa and told him that C.P. received three boxes, at C.P.'s
residence, all via FedEx, that C.P. did not order.  C.P. brought
the packages to the OPD station.  The packages were addressed to
C.P., but referenced "VitaCo" on line two of the mailing
address.  C.P. brought the packages to the OPD station and gave
officers consent to open the packages.

34.  Law enforcement opened the packages and tested the
powder inside.  Law enforcement presumptively identified the
powder as lactose.  Based on my training and experience, I know
that lactose is a "cutting agent" to dilute powdered drugs.

35.  I queried DHS's import/export indices and found that
another address shipment for "VitaCo" listed the "Ultimate
Consignee" as "Scott Chritophersen."  That parcel was shipped to
the United States from Canada in August 2017, and was described
as containing "Inert Excipients."[4]

**F.    Shooting at C.P.'s Home and CHRISTOPHERSON's Threats
to C.P.**

36.  At approximately 12:10 a.m. on or about March 3, 2018,
OPD dispatch received several reports of gunshots in Orange.
Law enforcement later learned that the gunshots occurred at

---

[3] Additionally, on or about January 15, 2018, C.P. received
a package from China that law enforcement opened.  The substance
inside tested negative for a controlled substance.

[4] Based on my training and experience, excipients are inert
substances that can be used as diluents for drugs.

C.P.'s address.  OPD officers arrived and discovered a vehicle
that was shot twice and a residence later identified as C.P.'s
house was shot once.  Law enforcement discovered that C.P.'s
mother was in the residence at the time of the shooting, and
that a bullet went through a wall and lodged in the
refrigerator.

  37.  Responding officers identified freshly-spray painted
graffiti with the names "Ghost" and "Conker" on the trashcans of
the residence.

  38.  OPD Officer Shryrock canvassed the area and located
surveillance footage from a nearby residence.  In the footage,
Officer Shryrock observed what he believed to be the vehicle
involved in the shooting, an older-model brown sport-utility
vehicle.  No license plate or individuals are clearly visible
from the footage that Officer Shryock viewed.

  39.  OPD Corporal Bueno canvassed the area and spoke with a
witness, Gustavo Zavala, who said that he heard three or four
gunshots, then saw an older brown Chevrolet Suburban speeding
away from the area.

  40.  At approximately 11:15 a.m. on March 3, 2018, law
enforcement met with C.P.  During an interview of C.P.,
Detective Alfaro learned the following in summary:

    a.  At approximately 12:12 a.m. that morning, while
out with friends, C.P. received two missed phone calls from
telephone numbers (714) 643-5134 and (714) 234-7902 (the "7902
Number").  C.P. was unfamiliar with the phone numbers and did
not answer the calls.

b.   At approximately 12:32 a.m., C.P. received a call from C.P.'s grandmother, who told C.P. that people shot at C.P.'s house that night.  C.P. drove home and found police at C.P.'s house.

c.   While there, C.P. saw the graffiti of the name "Ghost" on a trash can.  C.P. immediately suspected that CHRISTOPHERSON was involved, because s/he knew that CHRISTOPHERSON sometimes went by the moniker of "Ghost."

d.   At approximately 2:40 a.m., while getting food at a nearby taco shop, C.P. called the 7902 Number and heard a man answer.  C.P. recognized CHRISTOPHERSON's voice and told him, "I know you did it."  The man replied, "I know you're talking to the cops.  Keep it up and I'm going to kill you," then the man hung up.

e.   C.P. feared for C.P.'s life and believed CHRISTOPHERSON would carry out his threat.

41.  Detective Alfaro spoke with OPD Gang Unit Sergeant McCafferty, who advised Detective Alfaro that the second moniker, "Conker," was an alias for IBARRA, who was known to OPD.  When OPD detectives viewed IBARRA's Facebook profile, they saw it contained the moniker.  Additional queries of OPD's records showed that in a prior police contact, IBARRA had been identified as the similarly spelled "Konkr" and had provided the 7902 Number as his phone number to OPD officers during booking for a prior arrest in November 2017.

**G.    Search of the SUBJECT RESIDENCE**

42.  OPD detectives learned that the water and electric utilities at the SUBJECT RESIDENCE are in CHRISTOPHERSON's name.

43.  On or about March 3, 2018, OPD detectives initiated surveillance of the SUBJECT RESIDENCE to further investigate the shooting of C.P.'s residence.  When the detectives arrived at the SUBJECT RESIDENCE, they noticed a brown Chevrolet Suburban that matched the description of the suspect vehicle from the shooting of C.P.'s house.

44.  Shortly after initiating surveillance, at approximately 8:00 p.m., Detective Taketa saw CHRISTOPHERSON driving the brown Chevrolet Suburban away from the SUBJECT RESIDENCE.  Detective Taketa knew what CHRISTOPHERSON looked like based on pictures he had seen of CHRISTOPHERSON through the investigation.  Law enforcement saw CHRISTOPHERSON driving 65 miles per hour in a 50 mile per hour zone.

45.  OPD officers followed the Suburban and initiated a traffic stop.  CHRISTOPHERSON was then detained.

46.  OPD detectives obtained a state search warrant for the SUBJECT RESIDENCE.  The state search warrant permitted law enforcement to search for evidence of the shooting at C.P.'s house and allowed for night service.

47.  At approximately 2:00 a.m. on March 4, 2018, OPD personnel executed the state search warrant at the SUBJECT RESIDENCE.  During the search of the residence, law enforcement discovered that IBARRA leaved at the SUBJECT RESIDENCE, found IBARRA in the house, and found approximately 500 pills stamped

14

with "Xanax" markings in the room that IBARRA said was his
bedroom.

48.   OPD detectives placed IBARRA under arrest for state
charges related to the possession of Xanax for sale.  IBARRA was
notified of his Miranda rights, which he waived.  During an
interview with IBARRA, Detective Taketa learned the following,
in summary:

a.   IBARRA, CHRISTOPHERSON, and another man were
present for the shooting of C.P.'s residence;

b.   Before the shooting, CHRISTOPHERSON showed IBARRA
a handgun and told him they were driving to a woman's house to
intimidate her because she was providing police information
about CHRISTOPHERSON's involvement in drug sales.

c.   When they arrived at the residence,
CHRISTOPHERSON and the other man got out of the car, but IBARRA
did not.  Shortly thereafter, IBARRA heard gunshots.  IBARRA did
not see CHRISTOPHERSON shoot into the house, but IBARRA said he
thought that CHRISTOPHERSON was the shooter.

d.   After the shooting, IBARRA, CHRISTOPHERSON, and
the third man, got into the car and fled the scene.  At some
point after the shooting, they stopped to buy cocaine and
methamphetamine and then drove to CHRISTOPHERSON's warehouse at
41110 Sandalwood Circle, Suite 114, Murrieta, California 92562
(the "Murrieta location").

e.   IBARRA believed the gun used to perpetrate the
shooting was at the Murrieta location, as that was where IBARRA
knew that CHRISTOPHERSON kept his guns.

f.   IBARRA, who described himself as CHRISTOPHERSON's worker, told Detective Taketa that CHRISTOPHERSON maintained the Murrieta location as a shirt warehouse, and that it housed his pill-pressing operation.  IBARRA said he worked there pressing pills.

g.   CHRISTOPHERSON told IBARRA what chemicals and substances to use in the pill mixture, however, IBARRA claimed to not know what, specifically, was in the pills.  IBARRA claimed it was a stronger version of Xanax.

h.   IBARRA thought that CHRISTOPHERSON's pill-pressing operation at the Murrieta location produces approximately 100,000 pills every two days.

i.   IBARRA was unable to recall the exact address of the pill-pressing operation, but described it as being on Sandalwood Circle in Murrieta, California, with a business name of "SCSA."

49.   Following the search warrant of the SUBJECT RESIDENCE, CHRISTOPHERSON was placed under arrest.  At the time of his arrest, CHRISTOPHERSON was in possession of SUBJECT DEVICE 1.

**H.   Search of the Murrieta Location**

50.   OPD detectives drove to the Murrieta location and found business "SCSA."  Detective Taketa obtained a state search warrant for the Murrieta location to search for evidence of distribution of controlled substances and evidence of the shooting of C.P.'s house.

51.   At approximately 8:45 p.m. on or about March 4, 2018, law enforcement executed the state search warrant at the

16

Murrieta location.  A physical search resulted in the discovery of a large, commercial-grade chemical mixer, a pill press, SUBJECT DEVICE 2, SUBJECT DEVICE 3, SUBJECT DEVICE 4, unknown powders, and approximately several hundred thousand pills.  The gross weight of the pills, which I believe were all stamped with "Xanax" markings, was approximately 2.6 kilograms.

52.  SUBJECT DEVICE 3 appears to be part of security system that appeared to be connected to internal surveillance cameras.

53.  A shipping receipt containing CHRISTOPHERSON's name and the SUBJECT RESIDENCE's address was found at the Murrieta location.  Law enforcement also tested the keys that were discovered on CHRISTOPHERSON's person and discovered that one of the keys could open the locks at the Murrieta location.

## V.  TRAINING AND EXPERIENCE REGARDING BORDER PROTECTION SCREENING PROCEDURES AND PROTOCOLS

54.  Based on my experience and training and familiarity with investigations into border protection screening procedures conducted by other law enforcement agents, I know the following:

55.  CBP must examine and admit international mail parcels and shipments that arrive in the United States before they are delivered to their destinations by a carrier, including the USPS.  CBP officers are assigned to IMFs, like the LAX IMF in Torrance, California.  CBP officers conduct routine examinations of foreign mail service parcels at the LAX IMF as they enter the

United States before the parcels are prepared for delivery to their final destination.[5]

56.   Pursuant to their authority under Title 19, Code of Federal Regulations, Section 162.6 (also known as "Border Search Authority"), CBP officers and HSI SAs may conduct examinations of goods entering the United States without a search warrant, probable cause, or individualized suspicion.

57.   "Extended border searches" are permissible under the Border Search Authority and allow government officials to perform warrantless search if the following three requirements are satisfied: (a) the government is reasonably certain the person or commodity has crossed the border or that a "high degree of probability" exists that the border was crossed; (b) the government is reasonably certain that no material change in the person or object has occurred between the time of the border crossing and the time of the search; and (c) government has reasonable suspicion of criminal activity.

### VI. TRAINING AND EXPERIENCE RELATED TO TRAFFICKING IN XANAX, FENTANYL, FENTANYL ANALOGUES, AND FENTANYL-RELATED SUBSTANCES

58.   Based on my training, experience, and participation in drug trafficking investigations, my conversations and experience with other HSI SAs, CBP officers, chemists, pharmacologists, medical professionals, and other law enforcement officers, and

---

[5] Due to the large volume of cargo that enters the U.S. on a daily basis, CBP is unable to individually examine all parcels. CBP uses a variety of methods to select parcels for border search examination, including random and targeted inspections.

my knowledge and familiarity  with this investigation, I know
the following:

59.   Xanax is a Benzodiazepine and is a controlled
substance that can be abused by drug users.  Drug traffickers
often mix substances such as Fentanyl and other Benzodiazepines,
such as Clonazolam, to create counterfeit Xanax in order to
simulate the effect of Xanax.

60.   Fentanyl is a dangerous, synthetic opioid that is
approximately fifty to one-hundred times more potent than heroin
and morphine.  Fentanyl is lethal in doses as small as
approximately two milligrams.  Analogues of fentanyl have been
known to be approximately ten-thousand times more potent than
heroin and morphine.  A lethal dose of fentanyl can be
accidentally absorbed through the skin.  Fentanyl poses a danger
to not only its users, but also to law enforcement, customs
officials, medical professionals, first responders, and postal
workers and cargo carriers who unknowingly may come into contact
with the substance in its various forms while transiting through
the mail system.

61.   In addition to synthesis laboratories, many drug
trafficking organizations use "pill press" laboratories, where
they take fentanyl, fentanyl-related substances, and other
drugs, and manufacture illicit pills for distribution and sales.
These pill-pressing locations are frequently discovered in the
domestic United States.

62.   Due to the illicit nature of fentanyl its analogues,
and other controlled substances, Chinese and American

distributors and consignees conspire to conceal the existence of
the drugs, drug precursors, and associated materials or
manufacturing paraphernalia when they are shipped to the United
States.  In order to conceal the nature of shipments, shippers
often falsify documentation for shipments, including
import/export manifests.

## VII.  TRAINING AND EXPERIENCE REGARDING DRUG TRAFFICKING OFFENSES

63.  Based on my training and experience and familiarity
with investigations into drug trafficking conducted by other law
enforcement agents, I know the following:

64.  Drug traffickers often maintain books, receipts,
notes, ledgers, bank records, and other records relating to the
manufacture, transportation, ordering, sale, and distribution of
illegal drugs.  These records are often maintained where the
drug trafficker has ready access to them, such as at their
residence, or on their cell phones and other digital devices.

65.  Communications between people buying and selling drugs
take place by telephone calls and messages, such as e-mail, text
messages, and social media messaging applications, sent to and
from cell phones and other digital devices.  This includes
sending photos or videos of the drugs between the seller and the
buyer, the negotiation of price, and discussion of whether or
not participants will bring weapons to a deal.  In addition, it
is common for people engaged in drug trafficking to have photos
and videos on their cell phones of drugs they or others working
with them possess, as they frequently send these photos to each

other and others to boast about the drugs or facilitate drug
sales.

66.  Drug traffickers often keep the names, addresses, and
telephone numbers of their drug trafficking associates on their
digital devices.  Drug traffickers often keep records of
meetings with associates, customers, and suppliers on their
digital devices, including in the form of calendar entries and
location data.

67.  It is common for drug traffickers to own multiple
phones of varying sophistication and cost as a method to
diversify communications between various customers and
suppliers.  These phones range from sophisticated smart phones
using digital communications applications such as Blackberry
Messenger, WhatsApp, and the like, to cheap, simple, and often
prepaid flip phones, known colloquially as "drop phones," for
actual voice communications.

68.  Based on my training and experience, drug traffickers
may, in furtherance of drug trafficking, intimidate cooperators
and potential witnesses in order to protect the drug trafficking
organization.  They will use digital devices to coordinate the
intimidation by texting, calling, or sending photographs of
locations and weapons to intimidate potential witnesses.

69.  Drug traffickers often have supplemental security
systems that record the surroundings in order to protect the
drugs.  Such security systems are also likely to contain
evidence of the drug trafficker's own activities at the
warehouse and the presence of any co-conspirators.

21

## VIII.    TRAINING AND EXPERIENCE ON DIGITAL DEVICES

70.  As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

a.  Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment.  There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical

22

manuals and specialized equipment necessary to conduct a
thorough search.  In addition, it may be necessary to consult
with specially trained personnel who have specific expertise in
the types of digital devices, operating systems, or software
applications that are being searched.

        b.   Digital data is particularly vulnerable to
inadvertent or intentional modification or destruction.
Searching digital devices can require the use of precise,
scientific procedures that are designed to maintain the
integrity of digital data and to recover "hidden," erased,
compressed, encrypted, or password-protected data.  As a result,
a controlled environment, such as a law enforcement laboratory
or similar facility, is essential to conducting a complete and
accurate analysis of data stored on digital devices.

        c.   The volume of data stored on many digital devices
will typically be so large that it will be highly impractical to
search for data during the physical search of the premises.  A
single megabyte of storage space is the equivalent of 500
double-spaced pages of text.  A single gigabyte of storage
space, or 1,000 megabytes, is the equivalent of 500,000 double-
spaced pages of text.  Storage devices capable of storing 500 or
more gigabytes are now commonplace.  Consequently, just one
device might contain the equivalent of 250 million pages of
data, which, if printed out, would completely fill three 35' x
35' x 10' rooms to the ceiling.  Further, a 500 gigabyte drive
could contain as many as approximately 450 full run movies or
450,000 songs.

d.   Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet.[6] Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular

---

[6] These statements do not generally apply to data stored in volatile memory such as random-access memory, or "RAM," which data is, generally speaking, deleted once a device is turned off.

user's operating system, storage capacity, and computer habits.
Recovery of residue of electronic files from a hard drive
requires specialized tools and a controlled laboratory
environment.  Recovery also can require substantial time.

   e. Although some of the records called for by this
warrant might be found in the form of user-generated documents
(such as word processing, picture, and movie files), digital
devices can contain other forms of electronic evidence as well.
In particular, records of how a digital device has been used,
what it has been used for, who has used it, and who has been
responsible for creating or maintaining records, documents,
programs, applications and materials contained on the digital
devices are, as described further in the attachments, called for
by this warrant.  Those records will not always be found in
digital data that is neatly segregable from the hard drive image
as a whole.  Digital data on the hard drive not currently
associated with any file can provide evidence of a file that was
once on the hard drive but has since been deleted or edited, or
of a deleted portion of a file (such as a paragraph that has
been deleted from a word processing file).  Virtual memory
paging systems can leave digital data on the hard drive that
show what tasks and processes on the computer were recently
used.  Web browsers, e-mail programs, and chat programs often
store configuration data on the hard drive that can reveal
information such as online nicknames and passwords.  Operating
systems can record additional data, such as the attachment of
peripherals, the attachment of USB flash storage devices, and

the times the computer was in use.  Computer file systems can
record data about the dates files were created and the sequence
in which they were created.  This data can be evidence of a
crime, indicate the identity of the user of the digital device,
or point toward the existence of evidence in other locations.
Recovery of this data requires specialized tools and a
controlled laboratory environment, and also can require
substantial time.

       f.  Further, evidence of how a digital device has
been used, what it has been used for, and who has used it, may
be the absence of particular data on a digital device.  For
example, to rebut a claim that the owner of a digital device was
not responsible for a particular use because the device was
being controlled remotely by malicious software, it may be
necessary to show that malicious software that allows someone
else to control the digital device remotely is not present on
the digital device.  Evidence of the absence of particular data
on a digital device is not segregable from the digital device.
Analysis of the digital device as a whole to demonstrate the
absence of particular data requires specialized tools and a
controlled laboratory environment, and can require substantial
time.

       g.  Digital device users can attempt to conceal data
within digital devices through a number of methods, including
the use of innocuous or misleading filenames and extensions.
For example, files with the extension ".jpg" often are image
files; however, a user can easily change the extension to ".txt"

26

to conceal the image and make it appear that the file contains text.  Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.  In addition, decryption of devices and data stored thereon is a constantly evolving field, and law enforcement agencies continuously develop or acquire new methods of decryption, even for devices or data that cannot currently be decrypted.

71.  As discussed herein, based on my training and experience I believe that digital devices will be found during the search of the SUBJECT RESIDENCE.  Additionally, I have already seized the SUBJECT DEVICES.  I believe that some of the SUBJECT DEVICES, including the Huawei Nexus cell phone already seized, and the digital devices we may seize at the SUBJECT RESIDENCE, may have a feature that enables their users to unlock their devices through the biometric features of the user.

27

a.   I know from my training and experience and my review of publicly available materials that several hardware and software manufacturers offer their users the ability to unlock their devices through biometric features in lieu of a numeric or alphanumeric passcode or password.  These biometric features include fingerprint-recognition, face-recognition, iris-recognition, and retina-recognition.  Some devices offer a combination of these biometric features and enable the users of such devices to select which features they would like to utilize.

b.   If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints.  For example, Apple Inc. ("Apple") offers a feature on some of its phones and laptops called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device.  Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which on a cell phone is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the phone, and on a laptop is located on the right side of the "Touch Bar" located directly above the keyboard.  Fingerprint-recognition features are increasingly common on modern digital devices.  For example, for Apple products, all iPhone 5S to iPhone 8 models, as well as iPads (5th generation or later), iPad Pro, iPad Air 2, and iPad mini 3 or later, and MacBook Pro laptops with the Touch Bar are all equipped with Touch ID.

Motorola, HTC, LG, and Samsung, among other companies, also produce phones with fingerprint sensors to enable biometric unlock by fingerprint.  The fingerprint sensors for these companies have different names but operate similarly to Touch ID.

   c. If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face.  To activate the facial-recognition feature, a user must hold the device in front of his or her face.  The device's camera analyzes and records data based on the user's facial characteristics.  The device is then automatically unlocked if the camera detects a face with characteristics that match those of the registered face.  No physical contact by the user with the digital device is necessary for the unlock, but eye contact with the camera is often essential to the proper functioning of these facial-recognition features; thus, a user must have his or her eyes open during the biometric scan (unless the user previously disabled this requirement).  Several companies produce digital devices equipped with a facial-recognition-unlock feature, and all work in a similar manner with different degrees of sophistication, e.g., Samsung's Galaxy S8 (released Spring 2017) and Note8 (released Fall 2017), Apple's iPhone X (released Fall 2017).  Apple calls its facial-recognition unlock feature "Face ID."  The scan and unlock process for Face ID is almost instantaneous, occurring in approximately one second.

d.   While not as prolific on digital devices as fingerprint- and facial-recognition features, both iris- and retina-scanning features exist for securing devices/data.  The human iris, like a fingerprint, contains complex patterns that are unique and stable.  Iris-recognition technology uses mathematical pattern-recognition techniques to map the iris using infrared light.  Similarly, retina scanning casts infrared light into a person's eye to map the unique variations of a person's retinal blood vessels.  A user can register one or both eyes to be used to unlock a device with these features.  To activate the feature, the user holds the device in front of his or her face while the device directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data from the person's eyes.  The device is then unlocked if the camera detects the registered eye.  Both the Samsung Galaxy S8 and Note 8 (discussed above) have iris-recognition features.  In addition, Microsoft has a product called "Windows Hello" that provides users with a suite of biometric features including fingerprint-, facial-, and iris-unlock features.  Windows Hello has both a software and hardware component, and multiple companies manufacture compatible hardware, e.g., attachable infrared cameras or fingerprint sensors, to enable the Windows Hello features on older devices.

72.  In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than entering a numeric or alphanumeric passcode

or password.  Moreover, in some instances, biometric features
are considered to be a more secure way to protect a device's
contents.

73.  I also know from my training and experience, as well
as from information found in publicly available materials
including those published by device manufacturers, that
biometric features will not unlock a device in some
circumstances even if such features have been enabled.  This can
occur when a device has been restarted or inactive, or has not
been unlocked for a certain period of time.  For example, with
Apple's biometric unlock features, these circumstances include
when: (1) more than 48 hours has passed since the last time the
device was unlocked; (2) the device has not been unlocked via
Touch ID or Face ID in eight hours and the passcode or password
has not been entered in the last six days; (3) the device has
been turned off or restarted; (4) the device has received a
remote lock command; (5) five unsuccessful attempts to unlock
the device via Touch ID or Face ID are made; or (6) the user has
activated "SOS" mode by rapidly clicking the right side button
five times or pressing and holding both the side button and
either volume button.  Biometric features from other brands
carry similar restrictions.  Thus, in the event law enforcement
personnel encounter a locked device equipped with biometric
features, the opportunity to unlock the device through a
biometric feature may exist for only a short time.  I do not
know the passcodes of the devices likely to be found during the
search.

74.  In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device.  However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features (such as with Touch ID devices, which can be registered with up to five fingerprints), and it is also possible that the person in whose possession the device is found is not actually a user of that device at all.  Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device.  Thus, it will likely be necessary for law enforcement to have the ability to require CHRISTOPHERSON, IBARRA, and any individual who is found at the SUBJECT RESIDENCE and reasonably believed by law enforcement to be a user of the device to unlock the device using biometric features in the same manner as discussed in the following paragraph.

75.  For these reasons, if while executing the warrant, law enforcement personnel encounter a digital device that may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to, with respect to CHRISTOPHERSON, IBARRA, and every person who is located at the SUBJECT RESIDENCE during the execution of the search and who is reasonably believed by law enforcement to be a

user of a biometric sensor-enabled device that is a SUBJECT
DEVICE or is (a) located at the SUBJECT RESIDENCE and (b) falls
within the scope of the warrant: (1) compel the use of the
person's thumb- and/or fingerprints on the device(s); and (2)
hold the device(s) in front of the face of the person with his
or her eyes open to activate the facial-, iris-, and/or retina-
recognition feature.  With respect to fingerprint sensor-enabled
devices, although I do not know which of the fingers are
authorized to access any given device, I know based on my
training and experience that it is common for people to use one
of their thumbs or index fingers for fingerprint sensors; and,
in any event, all that would result from successive failed
attempts is the requirement to use the authorized passcode or
password.

76.  Other than what has been described herein, to my
knowledge, the United States has not attempted to obtain this
data by other means.

### IX. CONCLUSION

77.  For all the reasons described above, there is probable
cause to believe that CHRISTOPHERSON and IBARRA has committed a
violation of 18 U.S.C. §§ 371, 2320 (Conspiracy to Traffic in
Counterfeit Goods).  Also, for all the reasons described above,
there is probable cause to believe that the items described in
Attachment B are evidence,

///

///

///

33

fruits, and instrumentalities of the offenses described in Attachment B, and will be found in the digital device described in Attachment A-1, A-2, A-3.

_____
Nicholas A. DeSimone
Special Agent
Homeland Security
Investigations

Subscribed to and sworn before me
This 6th day of March 2018.

_____
HONORABLE ALEXANDER F. MACKINNON
UNITED STATES MAGISTRATE JUDGE